# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| Preston Moe, | Court File No. |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| Hyster-Yale Materials Handling, Inc. | **JURY TRIAL DEMANDED** |
| Defendant. | |

Plaintiff, Preston Moe, by and through his counsel, makes the following allegations based upon his personal knowledge, and upon information and belief, as well as upon his attorneys' investigation, and alleges as his complaint against Defendant as follows:

## JURISDICTION

1. This Court has subject-matter jurisdiction over this action pursuant to provisions of 28 U.S.C § 1332. Plaintiff is a citizen and resident of Austin, Minnesota and Hyster-Yale Materials Handling is located in Ohio. The Defendant sells its products throughout the United States, including Minnesota, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2. Venue is proper in this District under 28 U.S.C. § 1391(a) because a substantial part of the events giving rise to the claim occurred in this District and Defendant knowingly conducted business in this District.

## PARTIES

3. Plaintiff Preston Moe has, at all relevant times, been a citizen and resident of Minnesota, currently residing in Austin, Minnesota.

4. Defendant Hyster-Yale Materials Handling, Inc. ("Hyster") at all material times, was and is a corporation duly organized and existing under the laws of the State of Ohio and, at all material times, with its principal place of business located at 5875 Landerbrook Dr, Suite 300, Cleveland, OH 44124, and at all material times, was doing business within the State of Minnesota.

## FACTS COMMON TO THE CLAIMS

### The Product

5. Hyster designed, manufactured, assembled, tested, marketed, distributed and/or sold a product referred to as Lift Truck Model E40 HSD, serial number no. A219N02479C.

### The Product Failure

6. On September 21, 2017, Mr. Moe was working at a Hormel plant in Austin, Minnesota. He was operating the stand-up lift truck mentioned above that was designed and manufactured by Hyster.

7. The subject lift truck was equipped with a feature commonly referred to as a "dead man switch." The dead man's switch on this stand-up lift truck was, by information and belief, intended to prevent the lift truck from moving if the operator did not have their foot on a pedal on the floor of the lift truck. In other words, if the operator removed their foot from the pedal, the lift truck was supposed to stop and not be able to move.

8. The following photograph shows the occupant compartment of the lift truck, including the dead man switch/pedal:



9. On the date of the incident, Mr. Moe was operating the subject Hyster stand-up lift truck in reverse inside the Hormel plant. Mr. Moe removed his foot from the dead man switch pedal but the lift truck did not stop or slow down.

10. Unlike other stand-up lift trucks Defendant has designed, manufactured and sold, the subject stand-up lift truck was not equipped with a rear safety door to keep an occupant and their feet or limbs inside the occupant compartment where it is safe.

11. Because the subject Hyster stand-up lift truck did not have a rear safety door, Mr. Moe's left foot left the lift-truck's occupant compartment and was crushed between the back of the lift truck and a pole inside the plant.

12. The injuries to Mr. Moe's left foot were so severe, that about half of his foot was amputated.

## Defects in the Lift Truck

13. There were multiple defects in the lift truck that rendered it defective and unreasonably dangerous including the lack of a feasible and available rear safety door and a defectively designed dead man switch.

14. The dead man switch was defectively designed and/or manufactured because it failed under reasonably foreseeable use. Specifically, the spring that activated the switch broke rendering the dead man switch inoperable. The photograph below depicts the dead man switch activation arm and spring that were located underneath the dead-man switch pedal – a replacement spring is depicted in this photograph:



15. Based on investigation to date, but without the benefit of formal discovery, Plaintiff has a good faith belief the following defects existed in the dead man switch that caused the spring to fail and the switch to become inoperable:

   a. The subject spring was defectively designed and/or manufactured with materials that were not sufficiently durable to withstand reasonably

4

foreseeable cycling of the dead man switch pedal without fracturing or failing and, thus, disabling the dead man switch;

b. The spring and lever arm were designed in a manner that caused the spring to contract and expand in an arc rather than with straight compression and expansion which foreseeably lead to isolated flexing and wear on the spring and thus, failure; and

c. The spring and lever arm were designed to interact in a way that caused the lever arm to continuously interact with and "rub" against a specific portion of the spring, again leading to foreseeable wear and failure of the spring.

16. It was reasonably foreseeable to Defendant that a failure of the dead man switch on stand-up lift trucks create a hazard to operators and others in the vicinity of the lift truck.

17. The dead man switch, as designed and manufactured, was insufficient to withstand normal and foreseeable forces that would be applied to the spring in this application.

18. The subject stand-up lift truck was also defective because Defendant did not provide a rear safety door.

19. Stand up lift trucks – including the subject stand-up lift truck - are designed to be used in narrow confined areas where collisions are likely. The foreseeability of collisions is evidenced by the scrapes, dents and marks on the exterior of the subject lift truck.

20. Given the design intent and likelihood of collisions discussed above, it was foreseeable that the back of the lift truck would collide with objects within the foreseeable environment of use; especially if the dead man switch failed.

21. The likelihood the stand-up lift truck would foreseeably collide with other objects created a hazard for users of the subject lift truck. Specifically, the risk associated with the hazard to the operator is that serious injury or death could occur due to becoming caught between the lift truck and an object or being run over by the lift truck if the operator is ejected during a collision.

22. The subject stand-up lift truck should have been provided with a rear safety door to prevent the operator from inadvertently having their foot outside the lift truck while the lift truck was moving under power. The lack of a rear safety door rendered the subject lift truck defective and unreasonably dangerous.

23. The subject stand up lift truck was also defective because it did not contain adequate warnings and instructions to operators identifying the hazard of the operator's lower body being crushed between the rear of the forklift and a stationary object, stating the level of risk, or the precautions to be taken to avoid the hazard.

## **FIRST CAUSE OF ACTION**
## **NEGLIGENCE**

24. Plaintiff restates the above allegations as if fully set forth.

25. Nothing should be more important to companies that design, manufacture, test, distribute and sell products than product safety.

26. Because nothing should be more important than product safety, companies that design, manufacture, distribute and sell products should always analyze the product for potential hazards or defects – both at the design and manufacturing stages.

27. After the hazard analysis, reasonable care requires that the company must: a) eliminate hazards without unduly compromising the function or utility of the machine; b) to the extent the hazard cannot be designed out of the product, provide protection or guarding from remaining hazards; and c) if the hazards cannot be designed out or guarded against, provide warnings and instructions that can be practically followed to avoid the remaining hazards.

28. Defendant had a duty to design, manufacture, test, inspect, assemble, import, label, market, distribute and sell its Lift Truck Model E40 HSD to eliminate any unreasonable risk of foreseeable injury.

29. At all relevant times, Defendant breached this duty and failed to use reasonable care in designing, manufacturing, testing, inspecting, labeling, distributing, and selling the Lift Truck Model E40 HSD.

30. Defendant negligently designed, inspected, manufactured, distributed and sold the Lift Truck Model E40 HSD in a defective and hazardous condition as set forth in paragraphs 13 through 23 above. These defects existed when the Lift Truck Model E40 HSD left Defendant's control.

31. Defendant knew, or should have known, that incorporating improper designs as set forth in paragraphs 13 through 23 would result in the public buying a Lift Truck Model E40 HSD that could result in the deadman switch failing and a lift truck that did not provide protection against the operator's lower body being crushed between the rear of the forklift and a stationary object.

32. On information and belief but without the benefit of discovery, Plaintiff believes Defendant failed to properly test the design and manufacture of the Lift Truck Model E40 HSD, and specifically its dead man switch and lack of a rear safety door as set forth in paragraphs 13-23. For example, on information and belief, Defendant failed to perform proper testing to simulate the foreseeable and repeated use of the dead-man switch over the foreseeable useful life of Lift Truck Model E40 HSD, including but not limited to appropriate endurance and durability testing. Had Defendant performed proper testing, it would have discovered the defect in dead man switch design before the Lift Truck Model E40 HSD was released to the market.

33. On information and belief but without the benefit of discovery, Plaintiff believes Defendant failed to properly test and analyze the design of the Lift Truck Model E40 HSD with respect the foreseeable happening of an operator's lower body being crushed between the rear of the forklift and a stationary object. Had Defendant conducted proper testing and analysis of this hazard, it would have known that the rear safety door Defendant offered as an option of its stand-up lift trucks would have feasibly eliminated the unnecessary hazard of an operator's lower body being crushed between the rear of the forklift and a stationary object.

34. Defendant is liable to Mr. Moe for its negligence and for the injuries and damages to Mr. Moe that were directly and proximately caused by Defendant's negligence.

## SECOND CAUSE OF ACTION
## STRICT LIABILITY

35. Plaintiff restates the above allegations as if fully set forth.

36. At all material times material, Defendant was engaged in the business of designing, inspecting, manufacturing, testing, distributing and selling lift trucks, including Lift Truck Model E40 HSD.

37. As specifically discussed above, Defendant sold the Lift Truck Model E40 HSD in a dangerous and defective condition that rendered the lift truck unreasonably dangerous to foreseeable users and operators.

38. In addition to the defects discussed above concerning the design and manufacture of the dead man switch and lack of a rear safety door on the subject Lift Truck, these defects include, but are not limited to, Hyster's failure to properly warn foreseeable users and operators of Lift Truck Model E40 HSD of its defective and hazardous condition.

39. The Lift Truck Model E40 HSD was expected to and did reach the ultimate user without substantial change in the condition in which it was sold, imported and distributed.

40. Defendant knew, or reasonably should have known, of the danger posed by the defects in the dead man switch and lack of a rear safety door on the Lift Truck Model E40 HSD.

41. Defendant was required to warn about the danger posed by the foreseeable use of the potential failure of the dead man switch as discussed above. Defendant's failure to

9

provide adequate warnings and instructions also rendered the Lift Truck Model E40 HSD defective and unreasonable dangerous.

42. These defects in the Lift Truck Model E40 HSD were a direct and proximate cause of Mr. Moe's harms and losses.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment in his favor and against Defendant awarding the following:

1. A monetary award, well in excess of $75,000, sufficient to compensate Plaintiff for the following categories of damages:

   a.   General damages for severe disfigurement, disability, physical pain, mental suffering, inconvenience, and loss of the enjoyment of life;

   b.   Past, present, and future damages for costs of medical and rehabilitative treatment and care for Plaintiff;

   c.   Damages for loss of Plaintiff's lost wages and loss of earning capacity;

   d.   Past, present, and future damages for loss of Plaintiff's household services and assistance; and

   e.   Past, present, and future damages for care gratuitously rendered to Plaintiff.

2. Plaintiff's cost of this action, together with interest on past and future special and general damage amounts from the date of injury at the legal rate until paid, interest on any judgment awarded herein at the left rate until paid, and such other and further relief as the Court deems equitable and just.

## DEMAND FOR JURY

PLAINTIFF HEREBY DEMANDS A JURY TRIAL OF THIS MATTER ON ALL ISSUES SO TRIABLE.

TSR Injury Law

Dated: 3/10/2020

By: /s/ Nathan H. Bjerke
Nathan H. Bjerke (#026670X)
7760 France Ave. S., Suite 820
Bloomington, MN 55435
Phone: 952-767-3540
Fax:   952-835-8900
Email: nate@tsrinjurylaw.com

and

Kreg A. Kauffman (#54045)
Kauffman Law Firm
302 Ironwood Square
300 Third Avenue SE
PO Box 338
Rochester, MN 55903-0338
Phone:   507-285-5350
Fax:     507-285-5165
kkauffman@kauffmanlawfirm.com

*Attorneys for Plaintiff*